FILED - USDC -NH
2025 JUL 14 PM8:29

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEW HAMPSHIRE

**TORRENCE HOLT BECKER,**
 Plaintiff,

v.

**CITY OF MANCHESTER, NEW HAMPSHIRE,** a municipal corporation;
 **CHARLENE MICHAUD,** in her individual and official capacity as Director of Manchester City Welfare;
 **MARK [LAST NAME UNKNOWN],** in his individual and official capacity as Supervisor, Manchester City Welfare;
 **HEATHER MORAN,** in her individual and official capacities as Welfare Specialist II;
 **JOSEPH KELLY LEVASSEUR,** in his individual and official capacity as Alderman and Attorney, City of Manchester;
 **CAPTAIN ROBERT GRAVELLE,** in his individual and official capacity as Police Captain, Manchester Police Department;
 **CHIEF PETER MARR,** in his individual and official capacity as Police Chief, Manchester Police Department;
 **OFFICER CHRISTOPHER MCCARTHY,** in his individual and official capacity as Police Officer, Manchester Police Department;
 **OFFICER BRITTANY BATTYE,** in her individual and official capacity as Police Officer, Manchester Police Department;
 **SERGEANT DAN WHELAN,** in his individual and official capacity as Police Sergeant, Manchester Police Department;
 **KEVIN DIONNE,** in his individual and official capacity as Code Enforcement Supervisor, Manchester Planning and Community Development;
 **JOHN/JANE DOES 1-10,** in their individual and official capacities,

Defendants.

---

**Civil Action No.** _____
 **JURY TRIAL DEMANDED**

# VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

---

## I. PRELIMINARY STATEMENT

1. This civil rights action exposes Manchester's systematic policy of constitutional violation through coordinated inter-agency action. The City implemented official policies requiring welfare staff to refuse child safety concerns, coordinated with state agencies to circumvent Fourth Amendment protections, conducted warrantless home searches, and retaliated against citizens asserting constitutional rights. These violations are documented through signed refusal statements, inter-agency coordination logs, falsified police reports, and attorney-officials responding "piss off" to formal constitutional complaints.
2. This case seeks declaratory and injunctive relief, compensatory and enhanced compensatory damages, and comprehensive municipal reform to prevent continued systematic constitutional violations affecting vulnerable families and citizens.

## II. JURISDICTION AND VENUE

3. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343(a)(3) and (4) (civil rights), and 28 U.S.C. §§ 2201-2202 (declaratory relief).
4. Venue is proper pursuant to 28 U.S.C. § 1391(b) because all defendants reside in this district and all events occurred in Manchester, New Hampshire.

## III. PARTIES

5. Plaintiff Torrence Holt Becker is a Manchester resident and custodial parent of minor children affected by Defendants' constitutional violations.
6. Defendant City of Manchester is a municipal corporation that operated all relevant departments and employed all individual defendants.

7. Defendant Charlene Michaud is Director of Manchester City Welfare, sued individually and officially, with final policymaking authority for welfare operations.
8. Defendant Mark [Last Name Unknown] is a Welfare Supervisor, sued individually and officially.
9. Defendant Heather Moran is a Welfare Specialist II, sued individually and officially, who signed documentation explicitly refusing to hear child safety concerns.
10. Defendant Joseph Kelly Levasseur is a licensed attorney serving as Manchester Alderman, sued individually and officially, who responded "piss off" to formal constitutional complaints submitted through official city channels.
11. Defendant Robert Gravelle is Captain of Manchester Police Department, sued individually and officially, who repeatedly dismissed detailed constitutional appeals with form responses despite documented evidence of constitutional violations.
12. Defendant Peter Marr is Chief of Manchester Police Department, sued individually and officially, with final policymaking authority who failed to respond to escalated constitutional complaints.
13. Defendant Christopher McCarthy is a Manchester Police Officer, sued individually and officially, who falsified official police reports to conceal constitutional violations.
14. Defendant Brittany Battye is a Manchester Police Officer, sued individually and officially, who conducted warrantless searches of Plaintiff's home.
15. Defendant Dan Whelan is a Manchester Police Sergeant, sued individually and officially, who authored official memoranda defending and ratifying constitutional violations.
16. Defendant Kevin Dionne is Code Enforcement Supervisor, sued individually and officially, who coordinated with state agencies to circumvent constitutional protections.
17. Defendants John/Jane Does 1-10 are unknown Manchester employees who participated in the constitutional violations alleged herein.

## IV. FACTUAL ALLEGATIONS

### A. The Coordinated Constitutional Crisis (October 2024)

18. On October 2, 2024, DCYF initiated assessment of Plaintiff's family regarding housing conditions due to financial hardship affecting utilities reported by Manchester City Welfare.

19. On October 7, 2024, DCYF presented Plaintiff with a safety plan containing false information about his home conditions and threatened child removal unless he signed the document containing known falsehoods. When Plaintiff refused to sign false statements, DCYF initiated deliberate non-communication, ignoring Plaintiff until October 11, 2024. (EXHIBIT 1 - DCYF Safety Plan with False Statements)

20. **The Smoking Gun Coordination**: When Plaintiff lawfully denied DCYF entry to his residence on October 7, 2024, DCYF immediately coordinated with Manchester Code Enforcement to circumvent constitutional protections. DCYF Contact Log Sequence 65, dated October 8, 2024, 09:45 AM, documents this conspiracy: *"I spoke with Kevin Dionne (code enforcement). He will consider the call/message from Kim as a complaint and will be assigning an inspector to access the apartment. In the event that the tenant doesn't allow them in, he will let me know."* (EXHIBIT 2 - DCYF Coordination Conspiracy Documentation, EXHIBIT 8 - CODE ENFORCEMENT CHRONOLOGY)

21. This coordination was not a legitimate housing complaint but a manufactured administrative pretext designed specifically to circumvent Plaintiff's Fourth Amendment assertion. Defendant Dionne explicitly agreed to treat DCYF's constitutional denial as a "complaint" and promised to report back if constitutional rights were again asserted. (EXHIBIT 2 - DCYF Coordination Conspiracy Documentation, EXHIBIT 4 - HOUSING CODE COORDINATION)

22. Meanwhile, Defendant Moran at City Welfare explicitly refused emergency housing assistance on October 7, 2024, stating that unsafe housing arrangements were "implemented by DCYF" and that City Welfare could not intervene, despite knowledge of danger and available emergency resources. (EXHIBIT 3 - WELFARE REFUSAL DOCUMENTATION)

23. **The Documented Refusal**: On October 10, 2024, during a scheduled welfare assistance appointment, Plaintiff attempted to inform Defendant Moran that his safety concerns expressed on October 7 had been confirmed on October 9, but Moran refused to listen. Plaintiff then tried to describe upcoming weekend camping arrangements he had learned the children's mother was being forced to plan because City Welfare had no emergency housing available. When Plaintiff began describing these child safety concerns, Defendant Moran stated she **"refuses to listen to concerns of the safety of children"** Plaintiff immediately wrote this shocking statement on his Notice of Decision paperwork and asked Moran to sign it. She added that **"Safety issues must be directed to DCYF"** and signed the document,

despite knowing DCYF had been deliberately unreachable for nearly 72 hours during an active crisis. (EXHIBIT 3 - WELFARE REFUSAL DOCUMENTATION)

24. Supervisor Mark immediately affirmed this position by phone, confirming City Welfare would not consider child safety concerns under any circumstances. Director Michaud was notified by email but maintained the City's refusal to address emergency safety concerns. (EXHIBIT 5 - WELFARE COMPLAINT DOCUMENTATION)

25. **The Forced Camping**: As direct result of this coordinated constitutional violation, Plaintiff's family—including children suffering from upper respiratory infections—was forced to camp at a Weare campground during October weather with temperatures dropping to 37°F, rain, and without adequate camping gear. On October 12, 2024, Plaintiff was forced to call DCYF's emergency after-hours line to request help for his sick child because the City-arranged camping arrangement was wholly unsuitable and unsafe. (EXHIBIT 6 - FORCED CAMPING CRISIS DOCUMENTATION)

## B. Police Constitutional Violations and Cover-Up (April 2025)

26. On April 3, 2025, Defendants McCarthy and Battye conducted a "welfare check" that exceeded all constitutional boundaries and violated clearly established Fourth Amendment protections. (EXHIBIT 10 - POLICE COMPLAINT FILING)

27. **The Warrantless Search**: Defendant Battye positioned herself fully inside Plaintiff's apartment living room for at least "a couple of minutes", conducting systematic visual searches of multiple private rooms including Plaintiff's child's bedroom, kitchen, and second living area, without warrant, consent, or exigent circumstances after the welfare check's purpose had been fulfilled. Plaintiff's child, who had recently been hospitalized following a traumatic police encounter, immediately texted afterward: **"she acked [sic] me casual stuff. i took bob out cuz hes my emotional support lizrd [sic]"**—demonstrating the actual trauma caused by Officer Battye's warrantless search. (EXHIBIT 10 - POLICE COMPLAINT FILING, EXHIBIT 12 - POLICE SUPERVISORY COVER-UP, EXHIBIT 11 - MCCARTHY INCIDENT REPORT)

28. **The Falsified Cover-Up**: Defendant McCarthy's official incident report contains fundamental falsifications designed to conceal constitutional violations. He documented the encounter as occurring from 2:48-3:00 PM when it actually occurred from approximately 2:48-3:45 PM, and created timeline impossibilities claiming he called backup because Plaintiff's

instruction that his child "didn't need to answer the door" was "suspicious"—when his own documentation shows he was already calling backup before this conversation occurred. McCarthy also progressively altered his characterization of Plaintiff's statement from "you can close the door if you want to" (the actual words) to "close the door on them" (his on-scene mischaracterization) to "didn't have to answer the door" (his report fabrication). (EXHIBIT 11 - MCCARTHY INCIDENT REPORT)

29. **The "Common Hallway" Lie**: Sergeant Dan Whelan authored an official memorandum dated April 12, 2025, systematically defending these constitutional violations by falsely characterizing Plaintiff's private residential stairwell as a "common hallway." Whelan's memo states that McCarthy "simply used the common hallway as a mechanism to knock on the door to Mr. Becker's apartment," deliberately mischaracterizing a warrantless entry into Plaintiff's private residence as use of a public space. This institutional lie demonstrates that warrantless entries during welfare checks represent official municipal policy protected through supervisory falsification rather than individual misconduct. (EXHIBIT 12 - POLICE SUPERVISORY COVER-UP)

## C. Attorney-Official First Amendment Violations (August 2024)

30. Defendant Joseph Kelly Levasseur, a licensed attorney serving as Alderman, maintained a publicly accessible political Facebook profile used for official government communication with constituents.
31. Levasseur systematically blocks constituents from engaging with his social media profile, violating clearly established First Amendment precedent under *Knight First Amendment Institute v. Trump* and *Davison v. Randall*.
32. **The "Piss Off" Response**: When presented with a formal cease and desist letter citing constitutional violations and submitted through the official Manchester city website on August 13, 2024, Defendant Levasseur responded **"piss off"**—demonstrating deliberate contempt for constitutional rights by a licensed attorney serving in elected office. (EXHIBIT 9 - FIRST AMENDMENT VIOLATION)
33. Despite notification to the Mayor and other aldermen about these constitutional violations, no corrective action was taken, demonstrating institutional ratification of First Amendment violations by attorney-officials.

### D. Municipal Policy and Deliberate Indifference

34. The constitutional violations resulted from official municipal policies and widespread customs evidenced by: (a) written policies requiring staff to refuse child safety concerns; (b) signed documentation explicitly refusing to hear safety concerns; (c) documented inter-agency coordination to circumvent Fourth Amendment protections; (d) police customs authorizing warrantless entries with falsified documentation; (e) tolerance for attorney-officials violating First Amendment rights; (f) hierarchical implementation across multiple departments; and (g) supervisory ratification of violations. (EXHIBIT 7 - DCYF EVIDENCE COORDINATION)
35. Final policymakers across departments established and maintained these policies with deliberate indifference to constitutional rights, knowing coordinated systems would trap families in dangerous situations without constitutional recourse.
36. The City failed to train employees on constitutional obligations despite obvious need for such training, given vulnerable populations served and clearly established constitutional law.
37. The City had actual notice of constitutional violations through direct complaints, internal affairs reports, formal constitutional complaints to elected officials, and the obvious unconstitutional nature of policies refusing child safety concerns and coordinating constitutional circumvention.

## E. Post-Incident Institutional Cover-Up and Deliberate Indifference (April-June 2025)

38. On April 12, 2025, Sergeant Whelan authored an official memorandum containing fundamental factual errors designed to justify constitutional violations. The memo falsely characterized Plaintiff's private residential stairwell as a "common hallway" despite clear evidence of exclusive private use including Plaintiff's mail slot, children's artwork labeled with children's names, wedding book labeled "BECKER," and personal belongings. No reasonable person could mistake this private family space for a common area. (EXHIBIT 12 - POLICE SUPERVISORY COVER-UP)
39. The Admission of "Standard Protocol" Violations: Whelan's memo admits Officer Battye "stepped just inside of the threshold," "appears to quickly look left and right," and "briefly leans toward the bedroom," justifying this as "standard protocol" because officers want to "ideally view the living conditions of the apartment." This constitutes official admission that warrantless searches of private homes are routine department policy during welfare checks. (EXHIBIT 12 - POLICE SUPERVISORY COVER-UP)

40. On May 23, 2025, Plaintiff submitted a comprehensive appeal to Defendant Gravelle detailing the constitutional violations, including Officer Battye's warrantless search of multiple rooms, Officer McCarthy's timeline falsifications, and departmental confirmation that such conduct was consistent with policy. This appeal was copied to the New Hampshire Attorney General's Office, putting both MPD and state oversight on notice of systematic constitutional violations. (EXHIBIT 13 - INITIAL CONSTITUTIONAL APPEAL)
41. On May 26, 2025, Defendant Gravelle responded only that the matter had been "sent to the state's Civilian Review Committee (CRC)" without addressing any substantive constitutional issues raised in the detailed appeal, demonstrating initial deliberate indifference to documented violations. (EXHIBIT 13 - INITIAL CONSTITUTIONAL APPEAL)
42. On June 21, 2025, Plaintiff submitted two detailed communications to Defendant Gravelle: (1) identifying the fundamental factual error in Whelan's investigation characterizing Plaintiff's private stairwell as a "common hallway" despite clear evidence of exclusive private use, and (2) documenting constitutional violations and requesting immediate corrective action. Despite being provided specific evidence that the investigation was based on demonstrably false facts and constitutional violations admitted in MPD's own documentation, Defendant Gravelle repeatedly dismissed all appeals with form responses. (EXHIBIT 14 - FACTUAL ERROR CORRECTION; EXHIBIT 15 - CONSTITUTIONAL APPEAL TO GRAVELLE)
43. On June 27, 2025, Defendant Gravelle responded "This matter has been looked into by MPD and the CRC and is closed barring any new information," refusing to acknowledge constitutional violations documented in his department's own investigation memo. When Plaintiff pointed out this was new information requiring review, Gravelle continued dismissing constitutional violations with form responses. (EXHIBIT 16 - GRAVELLE DISMISSIVE RESPONSES)
44. On June 27, 2025, Plaintiff escalated to Defendant Marr, detailing constitutional violations, the "common hallway" mischaracterization, and Gravelle's refusal to address documented violations. Defendant Marr provided no response despite being chief executive with final policymaking authority, demonstrating institutional ratification of constitutional violations. (EXHIBIT 17 - ESCALATION TO CHIEF MARR)
45. These constitutional cover-up activities occurred during a period when the City had multiple opportunities to address documented constitutional violations through various channels, demonstrating systematic institutional deliberate indifference to constitutional compliance across all available avenues of accountability.

## V. CAUSES OF ACTION

### COUNT I - FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS VIOLATIONS (42 U.S.C. § 1983)

46. Plaintiff incorporates all preceding paragraphs.

47. **Against Defendants Michaud, Mark, and Moran (Welfare Officials):** These defendants violated substantive due process by implementing and enforcing official policies that shock the conscience, including: (a) Defendant Moran's documented refusal to "listen to child safety concerns" during an active crisis; (b) creating administrative deadlocks that forced sick children to camp in 37°F weather while emergency housing alternatives were available; and (c) conditioning all assistance on compliance with an unreachable state agency. (EXHIBIT 6 - FORCED CAMPING CRISIS DOCUMENTATION)
48. **Against Defendants Gravelle and Marr:** These defendants violated substantive due process through deliberate indifference to known constitutional violations by: (a) Defendant Gravelle repeatedly dismissing detailed constitutional appeals despite documented evidence of "standard protocol" warrantless searches; (b) Defendant Marr failing to respond to escalated constitutional complaints detailing systematic violations; and (c) both defendants ratifying official policies authorizing warrantless home searches during welfare checks that shock the conscience.
49. **Against Defendants McCarthy, Battye, and Whelan (Police Officials):** These defendants violated substantive due process by: (a) Defendant Battye conducting a 20-minute warrantless search of Plaintiff's home including his child's bedroom; (b) Defendant McCarthy falsifying official reports to conceal constitutional violations; and (c) Defendant Whelan authoring official memoranda defending these violations through institutional lies. (EXHIBIT 12 - POLICE SUPERVISORY COVER-UP)
50. **Against Defendant Dionne (Code Enforcement):** This defendant violated substantive due process by coordinating with DCYF to manufacture administrative pretexts for circumventing constitutional protections, as documented in DCYF Contact Log Sequence 65. (EXHIBIT 2 - DCYF Coordination Conspiracy Documentation)
51. **Against the City of Manchester:** The City is liable under *Monell* because these violations resulted from official policies implemented by final policymakers with deliberate indifference to constitutional rights.

## COUNT II - FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS VIOLATIONS (42 U.S.C. § 1983)

52. Plaintiff incorporates all preceding paragraphs.
53. **Against Defendants Michaud, Mark, and Moran:** These defendants deprived Plaintiff of protected interests in emergency public

assistance and family integrity without meaningful procedures by: (a) creating insurmountable procedural barriers through circular referrals to unreachable agencies without providing alternative emergency procedures; (b) refusing to provide any avenue for addressing emergency needs; and (c) denying any opportunity to be heard regarding safety concerns, as evidenced by Defendant Moran's signed refusal to listen. (EXHIBIT 5 - WELFARE COMPLAINT DOCUMENTATION)

54. **Against the City of Manchester**: The City is liable under *Monell* because these procedural violations resulted from official policies established by final policymakers.

## COUNT III - FIRST AMENDMENT VIOLATIONS (42 U.S.C. § 1983)

55. Plaintiff incorporates all preceding paragraphs.
56. **Against Defendant Levasseur**: This defendant violated First Amendment rights by: (a) systematically blocking constituents from his official social media platforms used for government communication, violating clearly established precedent under *Knight First Amendment Institute v. Trump*; and (b) responding "piss off" to formal constitutional complaints submitted through official city channels, demonstrating deliberate contempt for petition rights. (EXHIBIT 9 - FIRST AMENDMENT VIOLATION)
57. **Against Defendants Michaud, Mark, and Moran**: These defendants violated First Amendment petition rights by creating systematic barriers preventing petition for emergency assistance and maintaining deliberate policies that denied access to government officials during crises. (EXHIBIT 3 - WELFARE REFUSAL DOCUMENTATION)
58. **Against the City of Manchester**: The City is liable under *Monell* because these violations resulted from tolerance for attorney-officials violating First Amendment rights and policies preventing meaningful petition for redress.

## COUNT IV - FOURTH AMENDMENT VIOLATIONS (42 U.S.C. § 1983)

59. Plaintiff incorporates all preceding paragraphs.
60. **Against Defendants McCarthy and Battye**: These defendants violated Fourth Amendment protections by: (a) Defendant McCarthy entering Plaintiff's private residential stairwell without warrant, consent, or exigent circumstances; (b) Defendant Battye positioning herself inside Plaintiff's apartment for 20 minutes conducting warrantless searches of multiple private rooms including his child's bedroom; and (c)

both officers exceeding the scope of any legitimate welfare check purpose. (EXHIBIT 10 - POLICE COMPLAINT FILING, EXHIBIT 11 - MCCARTHY INCIDENT REPORT)
61. **Against Defendant Dionne**: This defendant violated Fourth Amendment protections by coordinating with DCYF to use code enforcement as administrative pretext for circumventing warrant requirements, as documented in DCYF Contact Log Sequence 65. (EXHIBIT 4 - HOUSING CODE COORDINATION, EXHIBIT 8 - CODE ENFORCEMENT CHRONOLOGY)
62. **Against Defendants Michaud, Mark, and Moran**: These defendants violated Fourth Amendment protections by conditioning essential utility assistance on consent to home inspections and participating in schemes to circumvent warrant requirements.
63. **Against the City of Manchester**: The City is liable under *Monell* because these violations resulted from coordinated municipal policies authorizing warrantless entries and conditioning benefits on constitutional waivers.

## COUNT V - CONSPIRACY TO VIOLATE CIVIL RIGHTS (42 U.S.C. § 1983)

64. Plaintiff incorporates all preceding paragraphs.
65. **Against Defendants Dionne, Michaud, Mark, and Moran**: These defendants **agreed and conspired** to deprive constitutional rights through a coordinated conspiracy to deprive constitutional rights by: (a) Defendant Dionne explicitly agreeing to treat DCYF's constitutional denial as a "complaint" and promising to report back if constitutional rights were again asserted; (b) Defendants Michaud, Mark, and Moran coordinating to refuse emergency assistance while knowing DCYF was deliberately unreachable; and (c) creating a closed loop preventing constitutional protection where assertion of Fourth Amendment rights triggers alternative administrative violations. (EXHIBIT 2 - DCYF Coordination Conspiracy Documentation, EXHIBIT 7 - DCYF EVIDENCE COORDINATION)

## COUNT VI - PROFESSIONAL MISCONDUCT UNDER COLOR OF LAW (42 U.S.C. § 1983)

66. Plaintiff incorporates all preceding paragraphs.
67. **Against Defendant Levasseur**: As a licensed attorney serving in elected office, this defendant owed heightened constitutional obligations due to his legal training and oath of office. His deliberate constitutional violations represent

willful misconduct by a legal professional who understood the constitutional implications of his actions, eliminating any good faith defense and justifying enhanced punitive damages. (EXHIBIT 9 - FIRST AMENDMENT VIOLATION)
68. **Against Defendant Gravelle**: As a supervisory law enforcement official with documented knowledge of constitutional violations occurring under his command, this defendant's deliberate indifference to detailed constitutional appeals represents willful misconduct by a trained professional, eliminating any good faith defense and justifying enhanced punitive damages.

## COUNT VII - DOCUMENT FALSIFICATION AND OFFICIAL OPPRESSION (42 U.S.C. § 1983)

69. Plaintiff incorporates all preceding paragraphs.
70. **Against Defendants McCarthy and Whelan**: Defendant McCarthy falsified official police records by documenting incorrect times (2:48-3:00 PM vs. actual 2:48-3:45 PM) and creating impossible timelines to justify constitutional violations. (EXHIBIT 11 - MCCARTHY INCIDENT REPORT)
71. **Against Defendant Whelan**: This defendant's characterization of Plaintiff's private residential stairwell containing mail slot, children's artwork, and family belongings as a "common hallway" despite obvious evidence of exclusive private use constitutes deliberate falsification designed to justify constitutional violations and prevent accountability for documented misconduct. (EXHIBIT 12 - POLICE SUPERVISORY COVER-UP)
72. This falsification was designed to create false administrative records supporting unconstitutional police conduct and preventing accountability for clearly established constitutional violations.

## VI. INJURIES AND DAMAGES

73. As direct result of Defendants' constitutional violations, Plaintiff suffered: (a) severe emotional distress from forced family separation and homelessness; (b) economic damages including emergency costs and lost wages; (c) ongoing harm to children's education and emotional well-being; (d) additional trauma to vulnerable child from warrantless searches; (e) deprivation of fundamental constitutional rights across multiple domains; (f) municipal failure damages from systematic

failure across government branches; and (g) costs and attorney's fees.
74. **Individual Defendants' Conduct**: Defendants Moran, McCarthy, Battye, Whelan, Levasseur, and Dionne acted willfully, maliciously, and with deliberate indifference to constitutional rights, justifying enhanced compensatory damages.
75. **Enhanced Damages for Professional Misconduct**: Defendant Levasseur's misconduct as a licensed attorney serving in elected office warrants enhanced compensatory damages due to his professional and official obligations to uphold constitutional rights.

# VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests:

**A. DECLARATORY RELIEF**: Declare Defendants' policies and practices violate the First, Fourth, and Fourteenth Amendments.

**B. INJUNCTIVE RELIEF**: Permanently enjoin Defendants from: (1) maintaining policies refusing child safety concerns; (2) creating administrative deadlocks preventing emergency assistance; (3) conditioning benefits on constitutional waivers; (4) coordinating to circumvent constitutional protections; (5) conducting warrantless searches during welfare checks; (6) blocking constituents from official social media; and (7) retaliating against citizens asserting constitutional rights.

**C. INSTITUTIONAL REFORM**: Order comprehensive policy reform, constitutional training for all department heads and elected officials, emergency assistance procedures independent of state agency availability, warrant requirements for home entries, enhanced protections for traumatized children, supervisory accountability measures requiring immediate response to constitutional complaints, mandatory constitutional training for all sworn personnel emphasizing Fourth Amendment limitations during welfare checks, prohibition on characterizing private residential spaces as "common areas" to justify warrantless entries, accountability measures, and federal court oversight with quarterly reporting.

**D. DAMAGES**: Award compensatory damages for emotional distress, economic losses, educational harm, loss of familial association, institutional constitutional crisis damages, and constitutional deprivation.

**E. ENHANCED COMPENSATORY DAMAGES:** Award punitive damages against individual defendants for willful conduct, with enhanced damages for professional misconduct by attorney-officials.

**F. ATTORNEY'S FEES:** Award fees and costs pursuant to 42 U.S.C. § 1988.

**G. JURISDICTION:** Retain jurisdiction to ensure compliance.

**H. GENERAL RELIEF:** Grant such other relief as deemed just and proper.

# VIII. JURY DEMAND

Plaintiff demands trial by jury on all claims so triable.

# VERIFICATION

I, Torrence Holt Becker, verify under penalty of perjury that I have read this Complaint and that the factual allegations pertaining to my personal experiences are true and correct to the best of my knowledge, information, and belief.

Executed on this 14 day of July, 2025.

_____
Torrence Holt Becker
Plaintiff

Respectfully submitted

162 Willow St
Manchester NH 03103
707-986-8679