**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

TORRENCE HOLT BECKER

     v.                                Civil No.  25-cv-263-LM-TSM

CITY OF MANCHESTER, ET AL.

**REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION TO DISMISS**

Self-represented Plaintiff, Torrence Holt Becker, alleges federal claims under 42 U.S.C. § 1983 against the City of Manchester (New Hampshire) and Manchester police officers, Christopher McCarthy and Brittany Battye, arising from their warrantless entry at his apartment in April 2025. Doc. Nos. 1, 7, & 11. The officers move to dismiss Becker's claims on the grounds of qualified immunity, and the City of Manchester moves to dismiss due to a lack of allegations to support municipal liability. Doc. No. 18. The motion is referred to the undersigned for a report and recommendation. See 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, the district judge should deny Defendants' motion to dismiss.

**LEGAL STANDARD**

"In assessing whether a complaint can withstand a Rule 12(b)(6) motion, [the court] accept[s] as true all well-pleaded facts, indulging all reasonable inferences in [the plaintiff's] favor." Hewes v. Pangburn, 162 F.4th 177, 189 (1st Cir. 2025) (citation omitted) (internal quotation marks omitted). Well-pleaded facts are "non-conclusory, non-speculative[ ] facts." Kolackovsky v. Town of Rockport, 165 F.4th 114, 119 (1st Cir. 2026) (citations omitted) (internal quotation marks omitted). To avoid dismissal, the plaintiff must allege "factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

"In ruling on a motion to dismiss, we consider the facts alleged in the complaint and the exhibits attached to it." Thornton v. Ipsen Biopharmaceuticals, Inc., 126 F.4th 76, 81 (1st Cir. 2025). "Generally, if the district court considers 'matters outside the pleadings' on a motion to dismiss under Rule 12(b)(6), 'the motion must be treated as one for summary judgment under Rule 56.'" Sierra v. Bisignano, 158 F.4th 43, 49 (1st Cir. 2025) (quoting Fed. R. Civ. P. 12(d)). A narrow exception to the general rule exists for "'documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint.'" Id. (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)).

Defendants filed and relied on videos from cameras worn by Officers McCarthy and Battye during the April 3, 2025 incident, noting that the videos are mentioned in a police report that Becker filed with the Complaint. Doc. No. 18; see also Doc. No. 1-1, Ex. 12. While that third-party reference alone might not be enough to allow consideration of the body-worn camera footage, Becker does not dispute the authenticity of the videos and, in fact, relies on them himself in support of his objection to Defendants' motion to dismiss. See Doc. No. 21 at pg. 11, et seq. In these circumstances, the court will consider the videos for purposes of assessing whether to dismiss the claims under Rule 12(b)(6). See Bowman v. Monteiro, No. 24-cv-10850, 2025 LX 322780, at *7, 2025 WL 2174871, at *3 (D. Mass. July 31, 2025) (concluding that properly authenticated body-worn camera footage that is central to plaintiff's claims may be considered for purposes of a motion to dismiss).

2

## BACKGROUND

### *Background from Preliminary Review*

The court completed preliminary review of Becker's complaint on September 15, 2025.

Doc. No. 7. The district judge approved the report and recommendation on preliminary review on

November 6, 2025. Doc. No.11. The court provides background information taken from the report

and recommendation on preliminary review.

In October 2024, Becker experienced financial hardship that led to the New Hampshire

Division of Children, Youth and Families ("DCYF") initiating an assessment of his family's

housing condition. Doc. No. 7 at pg. 2. During that time, Becker sought emergency housing

assistance from the Manchester Welfare Department, which was unsuccessful. Id. at pg. 3. The

court summarized Becker's allegations pertaining to Officers McCarthy and Battye as follows:

> Becker's allegations then move to April 3, 2025, when Manchester police
> officers Christopher McCarthy and Brittany Battye conducted a welfare check at
> his apartment. [Doc. No. 1] at ¶ 26. Becker alleges that Battye went into the
> apartment without a warrant or his consent and did a visual search of the apartment.
> Id. at ¶ 27. Becker further alleges that McCarthy's official incident report of the
> welfare check contained errors, including that the check occurred from 2:48 to 3:00
> p.m. when it actually occurred from 2:48 p.m. to 3:45 p.m. Id. at ¶¶ 28 & 38. Becker
> also challenges the sequence of events pertaining to McCarthy's reason for calling
> police back-up to the apartment. Id. at ¶ 28. Becker alleges that Sergeant Dan
> Whelan's memorandum about the incident incorrectly characterized the stairway
> outside of his apartment as a common hallway. Id. at ¶ 29. Becker alleges that he
> appealed Whelan's conclusions that no constitutional violations occurred, but the
> matter was closed after his complaints were reviewed by the Manchester Police
> Department and the New Hampshire Civilian Review Committee. Id. at ¶¶ 40-44.
> Thereafter, Captain Gravelle and Chief Marr did not respond to his demands for
> further review. Id.

Doc. No. 7 at pgs. 3-4. Sgt. Whelan's memorandum also explained the reason that Officer

McCarthy went to Becker's home on April 3, 2025. As written by Whelan:

> An Officer Drew from the Greenland, NH Police Department had called
> MPD [Manchester Police Department] to check on [Becker's child C.B.] as he had
> not been to school in approximately 2 weeks. [C.B.] had been living with his mother

in Greenland, but had gone to the hospital at some point, presumably a couple of weeks ago. From the hospital, [C.B.] went to stay with her father at the 162 Willow Street location. Officer McCarthy was advised that neither the mother or anyone from the school had heard from [C.B.] or his father; something that they naturally found concerning. A check condition was requested to ensure the safety of the child and to ascertain a reason as to why C.B. had not been attending school.

Doc. No. 1-1 at pg. 4. Based on review of Becker's complaint and documents filed with it, the court concluded that Becker stated a Fourth Amendment claim against Officers McCarthy and Battye "without prejudice to any defenses to a warrantless search that may be raised in a motion to dismiss." Doc. No. 7 at pgs. 12-13.

The court also concluded that Becker stated a Fourth Amendment claim against the City of Manchester. Id. at pg. 14. That claim was based on Becker's allegations, construed liberally, that the officers' Fourth Amendment violations occurred "because of 'coordinated municipal policies authorizing warrantless searches and conditioning benefits on constitutional waivers.'" Id. (quoting Doc. No. 1 at ¶ 63).

### *Body-Worn Camera Videos*

As is noted above, for purposes of Defendants' motion to dismiss, the parties rely on video footage from cameras worn by Officers McCarthy and Battye on April 3 when they went to Becker's home.[1] As shown at the beginning of Officer McCarthy's video, McCarthy parked some distance from the building where Becker's apartment was located and walked to the building. He passed a concrete walk that led to the side of the building and instead climbed stairs to a porch with three separate doors bearing the addresses 158, 160, and 162. Each door had its own address and mail slot and a lock. MV 15:15:27 - 15:16:18.

---

[1] Defendants provided the videos on a thumb drive that was filed conventionally with the court. Doc. Nos. 18-2 & 18-3. The court will cite McCarthy's video as "MV" with the time indicated as may be necessary and will cite Battye's video as "BV" also noting the time as may be necessary.

Officer McCarthy walked quickly to the door marked with the address 162. Without knocking or pausing, he opened the door and entered a small landing area. Inside the door is a flight of wooden stairs that turns and continues upward for another floor. There are no other doors visible from the landing area, and the stairs do not provide access to other landings or apartments. At the top of the stairs, there is a landing with one door. Outside the door is a table holding various items, and a piece of artwork and other items are on the floor leaning against the wall. MV 15:16:18-15:16:39.

As Officer McCarthy climbed the stairs, a dog can be heard barking from above. At the top of the stairs, Officer McCarthy knocked on the door and a young person answered the door, who is Becker's child and who the parties refer to as "C.B." After C.B. restrained the dog, Officer McCarthy confirmed C.B.'s identity and asked him to call his dad. McCarthy then called to get more information about the welfare check. After that call, McCarthy talked with C.B. about his mother, where he lived, and where his mother lived. McCarthy went back down the stairs and called the individual or office that asked for the welfare check. He reported that C.B. was fine and said that he was not sure how much further he could take the welfare check. McCarthy also reported that the apartment was fine. McCarthy confirmed by a photograph sent from the office that C.B. was the child who was the subject of the welfare check. MV 15:16:39-15:24:08.

Despite being satisfied that C.B. was fine, McCarthy went back upstairs and asked if C.B. had gotten through to his dad, which he had not, and then talked with C.B. about why he was not with his mom and why he was not going to school. Becker called C.B., and C.B. gave the phone to McCarthy. McCarthy asked for permission to walk through the apartment and asked Becker about why C.B. had not been to school. McCarthy said he could wait until Becker got to the apartment and told him another officer was coming as standard procedure. C.B. then took the

phone back and talked to his father.  During these interactions, McCarthy stood at the open door looking into the apartment. McCarthy overhead Becker tell C.B. that he did not have to talk to McCarthy and could close the door. MV 15:27:22-15:33:19.

Officer Battye arrived and climbed the stairs to the apartment. BV 15:34:05. McCarthy then went back downstairs to wait for Becker. McCarthy talked with someone about getting in touch with the juvenile department. Becker arrived, and McCarthy and Becker talked on the porch. McCarthy would not let Becker go upstairs. Becker explained why C.B. was not in school, why C.B. left his mother's house, his interactions with C.B.'s mother, and other events involving C.B. McCarthy raised his voice, would not let Becker go inside, would not let Becker check with C.B., and asserted that Becker was not cooperating. In particular, McCarthy expressed concern that Becker told C.B. to close the apartment door while McCarthy was standing there and McCarthy interpreted that instruction as a lack of cooperation by Becker.  MV 15:33:19 -15:46:54.

Officer Battye stayed with C.B. while Officer McCarthy went downstairs. Battye moved into the apartment and then went back to the doorway.  Battye asked about C.B.'s pet lizard that C.B. was holding and they talk about the lizard. BV 15:38:50. Battye's camera recorded the heated conversation between McCarthy and Becker from downstairs. Downstairs, Officer McCarthy gets contact information from Becker and then tells him that the case will be reported to DCYF and will be handled by that agency. MV 15:46:43-50. He called to Officer Battye who came downstairs, and the officers left the building. BV 15:47:27.

### *Related Case*

Before the incident on April 3, 2025, Becker brought suit against DCYF and DCYF employees, alleging violations of his federal rights and state law claims that arose from his dealings with DCYF during the fall of 2024. Becker v. DCYF, 24-cv-430 (D.N.H. filed Dec. 27, 2024)

6

("Becker I"). On preliminary review in that case, the court found that Becker stated a claim that DCYF social worker Kimberley McKenney violated his Fourth Amendment rights when she entered the same apartment that is at issue in this case without a search warrant. Becker I, ECF No. 10 at pg. 7. The court denied that part of McKenney's motion to dismiss based on qualified immunity in which she argued that a reasonable social worker in her position would not have known that the interior stairwell of the apartment was private and protected as curtilage. Id. at ECF No. 46 at pgs. 8-9.

Despite Becker's arguments to the contrary, the discussions and holdings in orders issued in that ongoing case, Becker v. DCYF, 24-cv-430, do not have preclusive effect against the different Defendants in this case. For purposes of the doctrine of res judicata under federal law, "[c]laim preclusion applies if (1) the earlier suit resulted in a final judgment on the merits, (2) the causes of action asserted in the earlier and later suits are sufficiently identical or related, and (3) the parties in the two suits are sufficiently identical or closely related." Airframe Sys., Inc. v. Raytheon Co., 601 F.3d 9, 14 (1st Cir. 2010). There is no final judgment in the DCYF case, and Becker sued different and unrelated defendants in that case. For that reason, the court does not consider the orders issued in Becker I for purposes of deciding Defendants' motions to dismiss in this case.

**DISCUSSION**

Officers McCarthy and Battye move to dismiss the claims against them based on qualified immunity on the grounds that officers in their position could have reasonably believed that they could enter the building and climb the stairs to the interior door for a "knock and talk" without a warrant and that exigent circumstances involving a missing minor allowed them to enter without a warrant. Doc. No. 18-1 at pgs. 5-7. The City of Manchester contends that Becker did not allege

a policy or custom that would support municipal liability and moves to dismiss on that basis. Id. at pgs. 7-8. Becker objects to all grounds raised by Defendants.  Doc. No. 21.

## I.      Officers - Qualified Immunity

State "officers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." D.C. v. Wesby, 583 U.S. 48, 62–63 (2018) (internal quotation marks omitted). "Clearly established" means that, at the time of the officer's conduct, the law was "sufficiently clear that every reasonable official would understand that what he is doing is unlawful." Id. at 63 (internal quotation marks omitted). The law must be settled, meaning that the rule "is dictated by controlling authority or a robust consensus of cases of persuasive authority." Id. (internal quotation marks omitted).

### A.  Knock and Talk

The officer Defendants assert that they are protected by qualified immunity because they reasonably believed that the "knock and talk" exception to the warrant requirement applied in the circumstances presented at Becker's apartment. Doc. No. 18-1 at pgs. 5-7. Becker contends that the "knock and talk" exception does not apply because the officers entered his apartment when they walked through the porch door. Doc. No. 21 at pgs. 12-15.

"At the 'very core' of [the Fourth Amendment] guarantee, as this Court has often stated, 'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" Case v. Montana, 146 S. Ct. 500, 505 (2026) (quoting Caniglia v. Strom, 593 U.S. 194, 198 (2021)). It is clearly established law that "[t]he Fourth Amendment ordinarily requires that police officers get a warrant before entering a home without permission." Lange v. California, 594 U.S. 295, 298 (2021). It was also clearly established in April 2025, when the

officers visited Becker's home, that the Fourth Amendment's protection of the home extends to its curtilage (the area immediately surrounding and associated with the home). Florida v. Jardines, 569 U.S. 1, 6 (2013).

Nevertheless, an officer may approach a home and knock at the front exterior door without violating the Fourth Amendment as long as the officer waits only briefly to be invited inside and then, if there is no permission given, leaves without intruding further. United States v. Bain, 874 F.3d 1, 12-13 (1st Cir. 2017). In the context of an apartment building, a tenant has no reasonable expectation of privacy in common areas in the building, and an officer does not violate the Fourth Amendment by entering a common area in order to knock at the specific apartment. United States v. Rheault, 561 F.3d 55, 59 (1st Cir. 2009); Sabey v. Butterfield, No. 23-cv-1095, 2026 LX 117978, at *27-*29, 2026 WL 706134, at *10 (D. Mass. Mar. 13, 2026); see also State v. Smith, 169 N.H. 602, 610-11 (2017) (cited by Defendants). On the other hand, a tenant retains Fourth Amendment protection in private areas, not shared with other tenants or the public, and that protection may exist even when the area is unlocked. See United States v. Rheault, 561 F.3d 55, 61 (1st Cir. 2009); United States v. Holleran, No. 18-cv-10064, 2018 LX 6198955, at *19-*20, 2018 WL 6198955, at *7 (D. Mass. Nov. 28, 2018)

For purposes of the current motion to dismiss, the Defendant officers assume that the stairwell from Becker's front door on the porch to the interior door of the apartment was not a common area. Doc. No. 18-1 at pg. 5 ("Assuming for the sake of the motion to dismiss that the stairwell leading to Plaintiff's apartment is not a common area . . ."). Based on that assumption, Defendants do not dispute that they entered Becker's apartment when they opened and went through the exterior porch door into the stairwell. They argue, nevertheless, for purposes of qualified immunity, that a reasonable police officer would not have understood the stairwell to be

9

a private part of the home that was protected by the Fourth Amendment instead of a common area that was not protected.  See id. at pgs. 5-6.

As noted above, the Fourth Amendment protection of an area in an apartment building depends on "the nature of the searched location." Rheault, 561 F.3d at 59. Areas used by other tenants, such as the porch at Becker's building, are common areas not protected by the Fourth Amendment. See id. at 60. On the other hand, an entryway used by only the individual claiming protection (or even by that individual and one other tenant) is private and protected by the Fourth Amendment. Id. That is evident when the exterior door provides access to only one apartment and no other tenants have access to the entry area. Id. at 61.

Becker's allegations and the officers' videos of the porch, exterior door, stairwell, and the third-floor landing demonstrate that a reasonable police officer would have known that the stairwell was private and not a common area used by other tenants in the building. There were three doors on the porch, each labeled with a single address and a mail slot. Each door had a door knob and a separate key lock. The officers opened the door labeled "162" that was Becker's address. The single address notified the officers that the door was for that apartment only.

Inside the exterior porch door was a small entry area with stairs going up. There were no interior doors or entrances to other areas of the building. The stairs went up two floors without a landing or any entrance at the second floor. The absence of access to or from the entry area and stairs to any other apartments or parts of the building demonstrated that the stairwell area was not a common area but instead was part of Becker's apartment.

At the top of the stairs, on the third floor, there was a short hallway to a single door that did not have an apartment number on the door.  There were items displayed on a ledge or molding detail along the wall, and a piece of artwork was leaning against the wall next to a small table with

10

more items, which Becker alleges included a dog leash and a wedding album. The lack of identification of the door with an apartment number indicated to the officers that the door was an interior door in the apartment, and the personal items outside the door also indicated that Becker used the area at the top of the stairs as part of his private space.

In summary, the allegations and the videos show that the officers entered Becker's private area through the exterior porch door without a warrant and without knocking or otherwise gaining permission to enter.[2] In April 2025, it was clearly established that officers could not enter the private area of a home without a warrant or the permission of the owner. Reasonable officers in the position of Officers McCarthy and Battye would have known that the area inside the exterior porch door was a private area not a common area. Therefore, the officers are not entitled to qualified immunity in the context of a motion to dismiss on Becker's Fourth Amendment claims against them based on a knock and talk theory.

B. Emergency

Alternatively, the officers contend that they are entitled to qualified immunity because officers in their position could have reasonably believed that the "check condition" call from the Greenland Police Department about C.B. was an emergency that required their immediate assistance without time to obtain a search warrant. Doc. No. 18-1 at pgs. 6-7. As a threshold matter, it was clearly established in April 2025 that the community caretaking doctrine, which allows police to provide assistance outside of ordinary police duties, does not alone provide an exception to the Fourth Amendment warrant requirement to enter a house. Caniglia, 593 U.S. at 198-99; accord Case, 146 S. Ct. at 506-07. Instead, under the emergency assistance exception to the warrant

---

[2] Becker alleges and the video appears to show that Officer Battye entered the living room area of the apartment without invitation or permission, which would be a Fourth Amendment violation even if the stairwell area was not a protected space.  Doc. No. 1 at ¶ 27; BV 15:38:50.

requirement, "officers may enter a home to 'render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" Case, 146 S. Ct. at 506 (quoting Brigham City v. Stuart, 547 U.S. 398, 400 (2006)); United States v. Giambro, 126 F.4th 46, 54 (1st Cir. 2025) ("Thus, law enforcement officers 'may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" (quoting Michigan v. Fisher, 558 U.S. 45, 47 (2009))). For the exception to apply, the officer's conduct must be objectively reasonable under the "totality of the circumstances."[3] Case, 146 S. Ct. at 507. Under Supreme Court and First Circuit precedent in April 2025, "[t]o justify warrantless entry under the emergency aid exception, [an officer must have had an] 'objectively reasonable basis for believing' that 'a person within [the house] is in need of immediate aid.'" Giambro, 126 F.4th at 55 (quoting Fisher, 558 U.S. at 47 (further internal quotation marks omitted)).

The officers argue that a reasonable officer in their position could have believed that an emergency existed because they were acting on a report that a minor had not been to school in two weeks. Nothing about that report, however, stated or even suggested that C.B. was injured or was in imminent danger of injury. The inquiry from the Greenland Police Department noted that C.B. was now living in Manchester with their father, that C.B. had not been to school for two weeks, and that neither the school nor C.B.'s mother had heard from C.B.'s father. The report included no information that C.B.'s father, Becker, was dangerous or would hurt C.B or that C.B. was otherwise in imminent danger of injury. See, e.g., United States v. D'Andrea, 648 F.3d 1, 11 (1st

---

[3] Prior to the decision in Case, some courts required probable cause for the search as well as exigent circumstances. See Robinsonv. City of Milwaukee, No. 24-cv-264, 2026 LX 199905, at *22, n.2, 2026 WL 836940, at *2, n.2 (E.D. Wisc. Mar. 26, 2026) (discussing change in the standard and prior standards). The First Circuit Court of Appeals, however, required an objectively reasonable basis to believe that an emergency existed and apparently did not always require probable cause. See Hill v. Walsh, 884 F.3d 16, 23 (1st Cir. 2018).

Cir. 2011) (holding that "powerful evidence" of past child abuse is insufficient to support the emergency assistance exception in the absence of evidence that the abuse was ongoing or future abuse was imminent).

The officers cite a hypothetical example used by Justice Kavanaugh in his concurring opinion in Caniglia v. Strom about a wellness check for an elderly man who was uncharacteristically absent from church. Doc. No. 18-1 at pg. 6. Even if that example had precedential effect, it is not persuasive in this context. In the example, the officers knew the man was elderly and was absent despite his usual routine. They knocked on the man's door but did not receive a response. In this case, C.B. was not in school but the report stated that C.B. was living with their father without any information about injury. Further, the officers entered the apartment without knocking. The court ascribes no weight to that example for purposes of qualified immunity in this case.

Further, even if the officers could have reasonably believed that an emergency existed that required them to enter Becker's apartment without a warrant, that belief was refuted when C.B. opened the interior door and McCarthy observed that he was fine and that the apartment was fine. McCarthy reported those findings by telephone that can be heard in the video. Despite his conclusion that no emergency existed, McCarthy did not leave, and instead he called for another officer to join him inside the apartment. Although McCarthy did not see or report an emergency, Battye entered the apartment and saw and conversed with C.B. who was not injured or in imminent danger of injury. Officers in their position at that time would not reasonably believe that an emergency existed to justify their warrantless entry into and continued presence inside the apartment.

## II.    City of Manchester-Municipal Liability

The City of Manchester argues that Becker's Fourth Amendment claim must be dismissed because Becker did not allege a municipal policy or custom to support municipal liability and instead relied on a statement made by Sergeant Whelan to demonstrate a city policy. Doc. No. 18-1 at pg. 8 (citing Doc. No. 1 at ¶ 29). It appears, however, that Manchester misread Becker's Complaint and the court's conclusion on preliminary review.

Paragraph 29 is part of the fact section of the complaint pertaining to "Police Constitutional Violations and Cover-Up (April 2025)." Doc. No. 1 at ¶¶ 26-29.  Becker alleges that after the April 3 incident at his apartment, when Officers McCarthy and Battye entered his apartment without permission or a warrant, Sergeant Whelan wrote a memorandum on April 12, 2025, in which he falsely stated that the stairwell was a common hallway. Id. at ¶ 29. Becker alleges that Whelan's mischaracterization of the stairwell "demonstrates that warrantless entries during welfare checks represent official municipal policy protected through supervisory falsification rather than individual misconduct." Id. Manchester argues that the allegation about official municipal policy cannot support the municipal liability claim because it was simply Whelan's opinion. Doc. No. 18-1 at pg. 8.

In the report and recommendation for preliminary review, the court concluded that "Becker alleges that Fourth Amendment violations occurred because of 'coordinated municipal policies authorizing warrantless searches and conditioning benefits on constitutional waivers.'" Doc. No. 7 at pg. 14 (quoting Doc. No. 1 at ¶ 63). While Becker alleges that Whelan's memorandum is evidence of the coordinated municipal policies that he alleges violated this Fourth Amendment rights, he did not rely exclusively on that statement to support his claim against Manchester. At

14

the motion to dismiss stage, like preliminary review, Becker's allegations are sufficient to state a Fourth Amendment municipal liability claim against Manchester.

**CONCLUSION**

For these reasons, the district judge should deny Defendants' motion to dismiss (Doc. No. 18). Any objections to this Report and Recommendation must be filed within fourteen days of receipt of this notice. The objection period may be extended upon motion. Failure to file any objection within the specified time waives the right to appeal the district court's Order. See Santos-Santos v. Torres-Centeno, 842 F.3d 163, 168 (1st Cir. 2016). Only those issues raised in the written objections "are subject to review in the district court," and any issues "'not preserved by such objection are precluded on appeal." Id. (internal quotation marks and citations omitted).

_____
Talesha L. Saint-Marc
United States Magistrate Judge

Dated:  June 24, 2026

cc:     Torrence Holt Becker, pro se.
        Counsel of record.

15